**CPC INTERNATIONAL INC., et al., Petitioners,**

v.

**Russell E. TRAIN et al., Respondents (two cases).**

**PENICK & FORD, LTD., Petitioner,**

v.

**Russell E. TRAIN, Respondent.**

**Nos. 74–1447 to 74–1449.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 10, 1975.

Decided May 5, 1975.

**1034**

Robert C. Barnard and Charles F. Lettow, Washington, D. C., for petitioners.

Kathryn A. Oberly, U. S. Dept. of Justice and Pamela Quinn, Environmental Protection Agency, Washington, D. C., for respondents.

Before MATTHES, Senior Circuit Judge, and HEANEY and WEBSTER, Circuit Judges.

HEANEY, Circuit Judge.

The petitioners are engaged in the processing of corn into starch, syrup, dextrose, animal feed and corn oil. They file petitions for direct review of three distinct groups of regulations[1] promulgated by the Administrator of the Environmental Protection Agency under the Federal Water Pollution Control Act Amendments of 1972. 33 U.S.C. §§ 1251 et seq.[2] The regulations relate to the "Corn Wet Milling Subcategory" of the "Grain Mills Point Source Category," and consist of:

(1) Standards of performance for *new* plants, promulgated under § 306(b);

---

1. The regulations were issued on March 20, 1974, and are codified in 40 C.F.R. §§ 406.10–406.16.

2. Hereinafter, section references will be to the Act as passed by the Congress.

3. The EPA contends that the regulations pertaining to existing plants were also promulgat-

(2) Pretreatment standards for *new* plants which discharge wastes into municipal treatment plants, promulgated under § 307(c); and

(3) Effluent limitations guidelines for *existing* plants, promulgated under § 304(b).[3]

All parties agree that we have jurisdiction under § 509(b) to directly review the regulations relating to new plants. The petitioners assert, however, that we do not have jurisdiction to directly review the guidelines for existing plants, and that such review is in the United States District Courts under the Administrative Procedure Act. 5 U.S.C. § 701 et seq. It is only because the EPA asserts that the guidelines are directly reviewable in the Courts of Appeals under § 509(b) that the companies have filed a protective petition here.[4]

We conclude that the guidelines for existing plants cannot be directly reviewed by this Court. Accordingly, we dismiss the petitions with respect to them. We set forth our reasons for this dismissal in Part I of this opinion and examine the new plant regulations in Parts II and III.

## I. JURISDICTION TO REVIEW THE GUIDELINES FOR EXISTING PLANTS.

### A. THE SCHEME OF THE 1972 ACT.

The Federal Water Pollution Control Act Amendments of 1972 restructure the federal program for water pollution control. The 1972 Act was enacted against a background of frustration and ineffectiveness in controlling the quality of the nation's waters. The keystone of the pre-1972 program had been the setting of "water quality standards" for interstate navigable waters. Under that pro-

ed pursuant to § 301(b). This is the basis of its jurisdictional argument.

4. The protective petition was necessary because § 509(b)(2) provides, in substance, that if review of the Administrator's action could have been obtained in the Court of Appeals under § 509(b)(1), it will not be subject to judicial review at the enforcement stage.

gram, if wastes discharged into receiving waters reduced the quality below permissible standards, legal action could be commenced against the discharger. To establish that a given polluter had violated the federal legislation, a plaintiff had to cross a virtually unbridgeable causal gap by demonstrating that the cause of the unacceptable water quality was the effluent being discharged by the defendant. The enforcement mechanism of the prior legislation was so unwieldy that *only one case* had reached the courts in more than two decades. *See* S.Rep.No.92–414, 92d Cong., 1st Sess. (1971), *reported in* A Legislative History of the Water Pollution Control Act Amendments of 1972 at 1423 (1973), U.S. Code Cong. & Admin.News, 1972, p. 3668.[5]

The 1972 Act brought about a major change in the enforcement mechanism by shifting the focus from water quality standards to effluent limitations. *See id.* at 1425. It provides in § 301(a) that the discharge of any pollutant is unlawful unless it is in compliance with conditions (effluent limitations) contained in a permit issued under § 402. Permits are to be issued by the EPA, or by those states whose permit programs have been approved by the EPA pursuant to § 402(a)(5).[6]

The Act declares that "it is the national goal that the discharge of all pollutants into the navigable waters be eliminated by 1985." § 101(a)(1). To move the country toward this goal, the Act establishes a system of standards and guidelines under which permit conditions are to become more and more restrictive,

culminating hopefully in a "zero-discharge" condition.

For new sources, the Administrator is directed to categorize sources and to "publish regulations establishing Federal standards of performance." § 306(b)(1)(B). The new source standards are to reflect

> * * * the greatest degree of effluent reduction which the Administrator determines to be achievable through application of the best available demonstrated control technology, processes, operating methods, or other alternatives, including, where practicable, a standard permitting no discharge of pollutants.

§ 306(a)(1).

For existing sources, § 301(b) of the Act provides:[7]

> * * * [T]here shall be achieved—
>
> (1)(A) not later than July 1, 1977, effluent limitations for point sources, other than publicly owned treatment works, * * * which shall require the application of the best practicable control technology currently available as defined by the Administrator pursuant to section 304(b) * * *.
>
> * * * * * *
>
> (2)(A) not later than July 1, 1983, effluent limitations for categories and classes of point sources * * * which * * * shall require application of the best available technology economically achievable for such category or class, which will result in reasonable further progress toward the national goal of eliminating the discharge of all pollutants, as determined

---

**5.** This two-volume set will hereinafter be cited as *Legislative History.*

**6.** Insofar as we have been able to determine, the Administrator has now approved the permit programs of twenty states. These include California, Connecticut, Delaware, Georgia, Kansas, Michigan, Minnesota, Mississippi, Montana, Nebraska, Ohio, Oregon, Vermont, Washington, Wisconsin, *see* 39 Fed.Reg. 26061 (1974), Maryland, *see id.* at 34601, Missouri, *see id.* at 40067, Hawaii, *see id.* at 43759, Indiana, *see* 40 Fed.Reg. 4033 (1975), and Wyo-

ming, *see id.* at 13026. Existing corn wet milling plants operate in Illinois, Indiana, Iowa, Missouri, Ohio, Pennsylvania and Texas.

**7.** In addition, all sources must comply with national discharge standards for toxic effluents, to be published by regulation pursuant to § 307(a). And any existing source which discharges its effluent into publicly-owned treatment works must comply with national pretreatment standards, to be published by regulation pursuant to § 307(b).

in accordance with regulations issued by the Administrator pursuant to section 304(b)(2) * * * which such effluent limitations shall require the elimination of discharges of all pollutants if the Administrator finds * * * that such elimination is technologically and economically achievable for a category or class of point sources as determined in accordance with regulations issued by the Administrator pursuant to section 304(b)(2) * * *.

The phrases used in § 301(b), "best practicable control technology currently available" and "best available technology economically achievable," are to be given content by the Administrator of the EPA in regulations which he is directed to publish under § 304(b):

For the purpose of adopting or revising effluent limitations under this Act the Administrator shall, after consultation with appropriate Federal and State agencies and other interested persons, publish within one year of enactment of this title [October 18, 1972], regulations, providing guidelines for effluent limitations, and, at least annually thereafter, revise, if appropriate, such regulations. Such regulations shall—

(1)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best practicable control technology currently available for classes and categories of point sources * * *; and

(B) specify factors to be taken into account in determining the control measures and practices to be applicable to point sources * * * within such categories or classes. Factors relating to the assessment of best practicable control technology currently available to comply with subsection (b)(1) of section 301 * * * shall include consideration of the total cost

of application of technology in relation to the effluent reduction benefits to be achieved from such application, and shall also take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate;

(2)(A) identify, in terms of amounts of constituents and chemical, physical, and biological characteristics of pollutants, the degree of effluent reduction attainable through the application of the best control measures and practices achievable including treatment techniques, process and procedure innovations, operating methods, and other alternatives for classes and categories of point sources * * *; and

(B) specify factors to be taken into account in determining the best measures and practices available to comply with subsection (b)(2) of section 301 * * * to be applicable to any point source * * * within such categories or classes. Factors relating to the assessment of best available technology shall take into account the age of equipment and facilities involved, the process employed, the engineering aspects of the application of various types of control techniques, process changes, the cost of achieving such effluent reduction, non-water quality environmental impact (including energy requirements), and such other factors as the Administrator deems appropriate * * *.

## B. THE JURISDICTIONAL ISSUE.

The jurisdictional issue hinges on the relationship of § 304(b) to § 301(b) and their relationship to the permit-issuing process under § 402. The parties agree that this Court has jurisdiction under § 509(b) [8] to directly review only certain

---

8. Section 509(b)(1) provides:

Review of the Administrator's action (A) in promulgating any standard of perform-

ance under section 306, (B) in making any determination pursuant to section 306(b)(1)(C), (C) in promulgating any effluent standard, prohibition, or treatment

actions of the EPA. The parties also agree that guidelines published under § 304(b) are not directly reviewable by this Court under § 509 and that, therefore, if the existing source regulations were published exclusively pursuant to § 304(b), we do not have jurisdiction to examine them in an original proceeding.

The EPA urges that the regulations were promulgated not only pursuant to a § 304(b) power to publish guidelines, but also pursuant to a § 301(b) power to publish limitations.[9] It contends that, in using the passive voice, "there shall be *achieved* * * * effluent limitations," Congress intended to require the EPA to promulgate effluent limitations by regulation under § 301(b). Such effluent limitations would then serve as minimum national standards for industry categories, to be mechanically cranked into individual permits issued by the states or the EPA. Since § 509 provides that actions of the Administrator under § 301 are directly reviewable in the Courts of Appeals, the EPA asserts that we have jurisdiction to review the regulations pertaining to existing sources.

The petitioners contend on the other hand that the EPA does not have power under § 301 to promulgate effluent limitations for existing sources by regulation. Instead, say the companies, the EPA is to publish guidelines under § 304(b), which shall be consulted by the permit-issuing authority. Under their view of the statute, the effluent limitations are to be set in the granting of individual permits.

■ We conclude that the statute does not grant to the Administrator a separate power under § 301 to promulgate by regulation effluent limitations for existing sources.[10] It follows that we cannot directly review the corn wet milling regulations relating to existing sources. Before explaining our reasons for reaching this conclusion, we stress several points. First, our conclusion is based on the intendment of the statute. Although policy arguments are advanced on behalf of a contrary interpretation by the EPA and by amicus Natural Resources Defense Council, Congress has resolved the policy issues against their position. Second, our conclusion that the existing source regulations were published solely under § 304(b) is by no means to denigrate their importance under the Act or to diminish their clout in the permit-issuing process.[11] Third, our conclu-

---

standard under section 307, (D) in making any determination as to a State permit program submitted under section 402(b), (E) in approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306, and (F) in issuing or denying any permit under section 402, may be had by any interested person in the Circuit Court of Appeals of the United States for the Federal judicial district in which such person resides or transacts such business upon application by such person. Any such application shall be made within ninety days from the date of such determination, approval, promulgation, issuance or denial, or after such date only *if such application is based solely on grounds which arose after such ninetieth day.*

9. The petitioners assert that, *even if the Act* contemplates separate regulations under § 301, these existing-source regulations can be no more than guidelines under § 304(b) because the EPA consistently stated throughout the rulemaking process that it was preparing guidelines. For the EPA to change its mind

now and assert that it was establishing limitations under § 301, they say, would violate the notice and comment requirements of the Administrative Procedure Act. We need not deal with this contention, since we hold that the EPA lacked power to publish effluent limitations by regulation under § 301. We note, however, that the final regulations were entitled "effluent limitations guidelines," *see* 40 C.F.R. §§ 406.12 and 406.13, and that that term has been defined by the EPA to mean regulations promulgated pursuant to § 304(b). *See* 40 C.F.R. § 401.11(j).

10. The Administrator does have authority to establish effluent standards for toxic pollutants under § 307(a), and pretreatment standards under § 307(b). *See* note 7, *supra.*

11. Section 402(d)(2) expressly provides that the Administrator may halt issuance of any state-issued permit if he determines that the conditions of the permit do not comply with the guidelines. The guidelines are to be as precise as possible to assure uniformity of permits for industry categories. *See* Conference

sion that the guidelines are not directly reviewable by this Court is not to be taken to imply that the guidelines are not otherwise subject to judicial review. Indeed, we believe that they are reviewable in the District Courts.[12]

### C. THE LANGUAGE OF THE ACT INDICATES THAT THE EPA IS NOT TO PROMULGATE EFFLUENT LIMITATIONS FOR EXISTING SOURCES BY REGULATION UNDER § 301.

We start with the observation that § 301 does not provide that the EPA is to promulgate effluent limitations by regulation. Other sections of the Act demonstrate that the omission of such a provision was not oversight, for Congress provided unambiguously for the promulgation of national standards in other sections of the Act. Nationally promulgated standards were expressly mandated for new sources [13] in § 306(b)(1)(B), for toxic discharges in § 307(a)(2), and for pretreatment standards in § 307(b) and (c). In providing for national standards in these areas, Congress did four things: (1) it used the term "standards," a word which takes on a special meaning be-

cause of its use under the Act; (2) it expressly provided that the standards were to be published by regulation; (3) it put deadlines on the process, requiring that the Administrator publish the standards within a fixed period of time; and (4) it provided that standards were to be enforceable independently of the permit system. *See* § 306(e); § 307(d).

■ Not only does the wording of § 301 belie the EPA's theory of statutory interpretation, but the permit provisions of the Act are inconsistent with the argument that the permit-setting authority is to be governed by regulations published under § 301. Section 402(d)(2) of the Act provides:

> No permit shall issue * * * if the Administrator within ninety days of the date of transmittal of the proposed permit by the State objects in writing to the issuance of such permit *as being outside the guidelines* and requirements of this Act. (Emphasis supplied.)

It is hard to imagine a clearer indication that the permit-issuing authority is to follow the guidelines promulgated under § 304(b),[14] and is not to refer to indepen-

Report in *Legislative History* at 309. Moreover, they are expected to define a
> * * * base level applicable to all plants within [a] category. * * * In no case * * * should any plant be allowed to discharge more pollutants per unit of production than is defined by that base level.

Senate Report in *id.* at 1468, U.S.Code Cong. & Admin.News, 1972, p. 3716.

Given the Administrator's power to issue permits in states not authorized to do so and to veto any state-issued permit which does not comply with the guidelines, carefully written guidelines can move the nation responsibly toward the goal of eliminating the discharge of all pollutants into navigable waters by 1985.

12. As we have previously stated, "judicial review is the rule, not the exception." Ratnayake v. Mack, 499 F.2d 1207, 1210 (8th Cir. 1974). *See also* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 410–413, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Environmental Defense Fund v. Corps of Engineers of United States Army, 470 F.2d 289, 298–299 (8th Cir. 1972), cert. denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160 (1973). We note that counsel for the government stated at oral argument that, if it were held that the existing source

regulations had been promulgated pursuant to § 304(b), they would be reviewable in District Court. We agree. *But see* American Paper Institute v. Train, 381 F.Supp. 553 (D.D.C. 1974), appeal pending, No. 74–1544 (D.C. Cir.).

13. The Act established separate regulatory schemes for new and for existing point sources. This reflects contrasting policies applicable to plants to be constructed in the future and those already in place. As Respondent Train, who was then Chairman of the Council on Environmental Quality, testified before the House Committee on Public Works:
> Across-the-board requirements can be justified for new plants, since they have many options in terms of processes, inputs, and the like, which is not the case for existing facilities.

*Legislative History* at 1115.

14. In E. I. DuPont de Nemours & Co. v. Train, No. 74–57, 383 F.Supp. 1244 (W.D.Va.1974), appeal pending, No. 74–2237 (4th Cir.), the court concluded that the word "guidelines" in § 402(d)(2) refers to § 304(h). *See id.* at Slip Op. 12. We cannot agree. The guidelines to be promulgated under § 304(h) concern the necessary elements of a state permit *program*; they say nothing about the conditions which

dent regulations promulgated under § 301.

Moreover, § 304(b) sets a one-year deadline for the promulgation of guidelines. If they are only for interim use by the EPA in promulgating regulations under § 301, it would be inexplicable for Congress to set a deadline for publication of the guidelines, yet fail to provide a deadline for the promulgation of the § 301 regulations.[15]

Finally, § 515 is inconsistent with the EPA's statutory interpretation. That provision established an Effluent Standards and Water Quality Information Advisory Committee [ESWQIAC]. Six months before the publication of guidelines under § 304(b) and standards under §§ 307(a) and 306(b), the Administrator is to notify the ESWQIAC of his intent to promulgate such regulations. The ESWQIAC may then hold public hearings on scientific and technical aspects of the proposed standards and guidelines. Whether or not hearings are held, the Act directs the ESWQIAC to transmit to the EPA, within 120 days, all relevant scientific and technical information which it possesses. If the EPA was intended to promulgate regulations under § 301, one would expect § 515 to require a reference to the ESWQIAC in such instances.

D. THE LEGISLATIVE HISTORY CONFIRMS THAT THE EPA IS TO SET GUIDELINES WHICH ARE TO BE FOLLOWED WHEN PERMITS ARE ISSUED, AND WHICH ARE TO SERVE AS THE BASIS OF THE ADMINISTRATOR'S VETO OF OBJECTIONABLE PERMITS.

■ The legislative history confirms that Congress intended to enforce uniformity of conditions for existing plants, not by authorizing the promulgation of regulations under § 301, but by granting the EPA power to issue permits and to veto state-issued permits which do not comply with guidelines promulgated under § 304(b).

When the Act was first being considered, EPA Administrator Ruckelshaus indicated that he understood that effluent limitations were to be set in the permit-issuing process, and that the EPA had no objection to that procedure. Testifying before a Senate subcommittee, Ruckelshaus stated:

* * * We believe that such Federal guidance is especially important in the area of effluent limitations. This concept is new in the law. It would be difficult and needlessly duplicative for each State to gather all the scientific, industrial, and technological information upon which effluent limitations must be based. Federal leadership must be provided here *so that the States, in setting effluent limitations,* have a clear idea of the task. (Emphasis supplied.)

Hearings Before the Subcommittee on Air and Water Pollution of the Senate Committee on Public Works 19 (1971). In a letter to Chairman Blatnik of the House Public Works Committee, Ruckelshaus was equally clear on his understanding of the meaning of the Act:

* * * Effluent limitations required by Section 301 *would be established* and applied to all point sources * * * *by means of the permits* issued under Title IV.

We favor the approach whereby effluent limitations would be applied to

---

must be written into a permit. Moreover, the remedy for state failure to comply with the § 304(h) guidelines is not rejection of a given permit under § 402(d)(2), but EPA withdrawal of approval of the whole state permit program. *See* § 402(c)(3). Clearly, the word "guidelines" in § 402(d)(2) *refers to* § 304(b). *See* Senator Muskie's comments on the Conference Bill in *Legislative History* at 176, *quoted* at p. 1042, *infra*.

15. Where the Act requires the Administrator first to assemble and publish information and only thereafter to publish standards on the basis of that information, different deadlines were put on each of the two stages. *Compare* § 304(c) *with* § 306(b)(1)(B) [new source standards]; *compare* § 307(a)(1) *with* § 307(a)(2) [toxic discharge standards]; *compare* § 304(f) *with* § 307(b) and (c) [pretreatment standards].

dischargers through a permit mechanism. * * * (Emphasis supplied.)

*Legislative History* at 844.

The Senate Report on S. 2770, issued in 1971, demonstrated a similar understanding of the role of the guidelines in the permit-issuing process. It declared:

> * * * By 1976 each discharge source should have applied for, and received, a permit *setting forth* the effluent limitations that will be required in this phase. * * * (Emphasis supplied.)

*Id.* at 1463, U.S.Code Cong. & Admin. News, 1972, p. 3711.

Under the EPA's current interpretation of the statute, the permits would not "set forth" the effluent limitations, but would "incorporate" them. The Senate Report continued:

> Subsection (b) of this section [304] requires the Administrator, within one year after enactment, to publish guidelines for setting effluent limitations reflecting the mandate of § 301, which will be imposed as conditions of permits issued under section 402. * * * Thus, *these guidelines would define the effluent limitations* required by the first and second phases of the program established under section 301. * * * (Emphasis supplied.)

*Id.* at 1469, U.S.Code Cong. & Admin. News, 1972, p. 3717.

The House Report on H.R. 11896, issued March 11, 1972, also provides a clue to the shared understanding of the statutory scheme. In separate views accompanying that report, Representative Terry expressed concern that the Act nowhere provided for judicial review of the § 304(b) guidelines:

> * * * Many * * * significant areas in the legislation where the administrator has a great deal of discretionary action are * * * without [judicial] review. These include * * Section 304, the Federal guidelines * * *.
>
> Since the permit program is fundamental to implementation of the Act,

and guidelines promulgated by EPA under Section 304 are key to the pollution control conditions for discharge under the permits, whether issued by EPA or by a state * * * an administrative review procedure of Section 304 guidelines * * * is essential. * * * (Emphasis supplied.)

*Legislative History* at 892.

If the guidelines were merely intended to be a first step in the promulgation of effluent limitations under § 301, Representative Terry's concern over lack of judicial review of the guidelines seems unnecessary. However, if the guidelines were intended to be the only federal step defining limitations for existing sources, they take on the increased importance which he attributed to them.

The importance which Representative Terry attributed to the guidelines was shared by Representative Robison during the House debate on the original bill. He defended the House version of § 402(d), which contained no veto power for the EPA, as follows:

> * * * The organized environmentalists argue * * * that it is essential for EPA to retain * * * the right to veto any State-issued discharge permit * * * to insure uniform water quality standards across the Nation * * *. But these arguments miss the point that it is EPA, under the House bill, which will set, in the first instance, the uniform, national standards *by way of guidelines* —with which all State programs will have to comply. * * * (Emphasis supplied.)

*Legislative History* at 727.

The most instructive portions of the legislative history are those concerning the debate over whether the EPA Administrator should have the authority to veto state-issued permits. The debate is important not only because of what was said, but also because the creation of the veto power would make no sense if the EPA was already empowered to promul-

gate regulations under § 301. Section 402(d)(2) in the Senate Bill provided:

> No permit shall issue until the Administrator is satisfied that the conditions to be imposed by the State meet the requirements of this Act.

*Legislative History* at 1690.

The House Bill, however, provided a veto power only where an affected state, other than the one issuing the permit, objected in writing to the Administrator. *Id.* at 1058–1059.

The difference in the two bills was a matter of importance to Representatives Abzug and Rangel, who objected to the lack of a veto power in the House Bill in separate views attached to the House Report. *Id.* at 867–871. It is crucial to note that they felt the need of a veto power *because* the Act did not provide for nationally promulgated effluent standards for existing plants:

> The Bill would repeal President Nixon's permit program and hand it over to state control after enactment with no guaranteed federal review of permits issued by states *and no national minimum effluent requirements for each state permit.* This will surely result in some companies having a competitive advantage over others and loss of jobs. (Emphasis supplied.)

*Id.* at 867.

They quarreled with not one, but two aspects of the bill's provisions for existing sources: lack of federal review after the permit issuance *and* lack of nationally promulgated effluent standards. Their recommendation was that the permit provisions of the bill should be entirely deleted, and that the current federal permit program which had been established under the Refuse Act of 1899 should be retained. Only that approach would solve both of the proposed bill's defects. They continued:

> *If this is not done,* and the States are allowed to issue permits, then, *at the very least,* the bill should give EPA authority
>
> (a) to review all permit applications; and
>
> (b) to prevent the issuance of any permit to which it objects. (Emphasis supplied.)

*Id.* at 871.[16]

The conferees adopted a version of § 402(d)(2) which gave the Administrator a veto power over state permits, but in doing so, they established only "the very least" which Representatives Abzug and Rangel had sought: they did not provide for nationally promulgated effluent standards for existing sources. The wording of § 402(d)(2)—specifically its reference to guidelines—is critical, for that language was not used in any prior draft of the bill, and is therefor not to be dismissed as an archaic holdover from an earlier draft. It is in this light that

---

**16.** The plea of Representatives Abzug and Rangel for a veto power was carried to the floor of the House, where an attempt to amend the original House Bill was defeated. In the process of advocating the EPA veto power, Representative Reuss raised a "forum-shopping" argument which the EPA has once again raised in this litigation:

> * * * [T]he greatest political barrier to effective pollution control is the threat by industrial polluters to move their factories out of any State that seriously tries to protect its environment. That threat can be answered only by a review at the Federal level of permits.

*Legislative History* at 577.

Although Representativè Reuss' setback on the veto power was only a temporary one, since the Conference Bill eventually adopted it,

his opponents' answer to the forum-shopping fear was as valid then as it is today: an existing plant cannot change its forum without becoming a new plant, in which case it would be subject to the uniform national standards for new plants promulgated under § 306. *See Legislative History* at 579–580 (Remarks of Representative Roe). *See also id.* at 379 (Remarks of Representative Clausen). The real danger from lack of uniform standards for existing sources is competitive disadvantage, as Representatives Abzug and Rangel recognized in their supplementary views to the House Report. *See id.* at 867. They urged that the latter problem could be totally cured only by retention of the Refuse Act permit program, or creation of a totally federally controlled permit system. Failing that, they argued that, "at the very least," a veto power was necessary to lessen the danger.

its proviso, that the Administrator may veto permits which do not comply with the *guidelines*,[17] takes on vital importance.

The Conference Report adds to the evidence indicating that there is no § 301 power to establish effluent limitations by regulation. The Report declares:

> Except as provided in section 301(c) of this Act, the intent of the Conferees is that effluent limitations applicable to individual point sources within a given category or class be as uniform as possible. The Administrator is expected to *be precise in his guidelines* under subsection (b) of this section [304], *so as to assure* that similar point sources with similar characteristics, regardless of their location or the nature of the water into which the discharge is made, will meet similar effluent limitations. (Emphasis supplied.)

*Legislative History* at 309.

This preoccupation with the precision of the guidelines as the means of achieving uniformity makes no sense in a regime where the permit-issuing authorities are to look, not to the guidelines, but to regulations promulgated under § 301.

Finally, the debates on the floor of the House and the Senate on the Conference Bill demonstrate that Congress did not envision regulations under § 301 as a part of the process whereby effluent limitations for existing sources would be set. In describing the final bill to the House, Representative Jones, who acted as floor manager, stated:

> * * * [I]t is intended that the State shall have primary responsibility for determining whether a discharge complies *with the guidelines.* * * * (Emphasis supplied.)

*Legislative History* at 234.

And, in summarizing the Conference draft on the floor of the Senate, Senator Muskie declared:

> The Conference agreement provides that the Administrator may review any permit issued pursuant to this Act

as to its consistency with the guidelines and requirements of the Act. Should the Administrator find that a permit is proposed *which does not conform to the guidelines issued under section 304* and other requirements of the Act, he shall notify the State of his determination, and *the permit cannot issue* until the Administrator determines that the necessary changes have been made to assure compliance with such guidelines and requirements. * * * (Emphasis supplied.)

*Id.* at 176.

## E. OUR HOLDING THAT THE EPA LACKS POWER TO PROMULGATE EFFLUENT LIMITATIONS BY REGULATION UNDER § 301 IS NOT INCONSISTENT WITH OTHER PROVISIONS OF THE ACT, AND DOES NOT RENDER THEM MEANINGLESS.

The remaining arguments of the EPA are not persuasive in view of the overwhelming evidence of statutory intent. First, the EPA points to § 301(e), which provides:

> Effluent limitations established *pursuant to this section* or section 302 * * * shall be applied to all point sources * * *. (Emphasis supplied.)

We do not find this inconsistent with our holding, for limitations established in permits *are* "pursuant to" § 301's command that application of certain technologies be required.

Second, the EPA points to § 303(d)(1)(A), which requires each state to

> * * * identify those waters within its boundaries for which the effluent limitations required by section 301(b)(1) * * * are not stringent enough to implement any water quality standard applicable to such waters. * * *

Again, this gives no indication of *how* the § 301 effluent limitations are to be

---

17. *See* pp. 1038–1039, *supra.*

established, but merely recognizes that the "best practicable" and "best available" requirements of § 301 may not suffice where unacceptable water quality would persist.

Third, the EPA notes that § 309(a)(3), (c) and (d) proscribe violations of "§ 301 * * * or any permit condition." It argues that this demonstrates that § 301 limitations are to exist independent of the permits. The argument is a *non sequitur,* for § 301(a) prohibits discharging *without* a permit, and it is to that conduct which § 309 is addressed.

Fourth, the EPA points to § 505(f), which defines "effluent standard or limitation" to include:

> * * * (1) * * * an unlawful act under [§ 301(a)]; (2) an effluent limitation or other limitation under section 301 or 302; * * * or (6) a permit or condition thereof * * *.

The EPA urges that, under this Court's interpretation of the Act, "the second definition * * * would be redundant with the sixth." E. I. DuPont de Nemours & Co. v. Train, 383 F.Supp. 1244 (W.D.Va.1974), appeal pending, No. 74–2237 (4th Cir.). We do not agree. The independent reference to § 301 is necessary because § 301(f) bans the discharge of radiological, chemical and biological warfare agents and highlevel radioactive wastes.

Fifth, the EPA notes that § 509 (b)(1)(E) grants judicial review of the Administrator's action in

> * * * approving or promulgating any effluent limitation or other limitation under section 301, 302, or 306 * * *.

We do not find this inconsistent with our holding. The reference to § 301 is necessary if the Administrator's action under § 301(c), modifying the application of the 1983 requirements to certain point sources, is to be subject to judicial review.

Sixth, amicus Natural Resources Defense Council argues that, unless the EPA's statutory interpretation is adopted, "a loophole as big as a barn door" will be created. It contends that, unlike § 304(b) regulations, § 301 regulations would be enforceable independent of the permit process. We cannot agree. The Act does not provide that effluent limitations under § 301 are enforceable independent of the permit system. This is in contrast to national standards for toxic discharges and for new sources. *See* §§ 307(d) and 306(e).[18] Moreover, § 402(k) expressly provides that compliance with a permit condition will be deemed to be compliance with the requirements of § 301.

■ In sum, the Act and the legislative history demonstrate that the EPA does not have power to promulgate effluent limitations for existing plants by regulation under § 301,[19] and we see nothing in any other provision of the Act which is inconsistent with this conclusion. Accordingly, we do not have jurisdiction to directly review the regulations pertaining to existing sources.

## II. THE NATIONAL STANDARDS OF PERFORMANCE FOR NEW SOURCES.

■ Our review of the Administrator's action in promulgating the national standards of performance for new

---

18. *See also* p. 1038, *supra.*

19. The Court's comments to the contrary in Natural Resources Defense Council, Inc. v. Train (1974), D.C.Cir., 510 F.2d 692 at 707–710, were clearly dictum, and the Court took the extraordinary step of expressly acknowledging that fact in a supplementary order issued on March 10, 1975.

One District Court has squarely faced this issue, and concluded that the EPA has power under § 301 to establish effluent limitations by regulation. E. I. DuPont de Nemours & Co. v. Train, *supra.* The court there based its conclusion primarily on the arguments which we find unpersuasive in part I.E. of this opinion.

The other District Court, which the EPA cites for authority, held that guidelines promulgated under § 304(b) are reviewable *nowhere.* American Paper Institute v. Train, *supra,* at 554. That court's remarks that it also believed that effluent limitations had been and could be promulgated under § 301 were dictum.

sources[20] is limited to a determination of whether the Administrator's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *Cf.* Union Electric Co. v. Environmental Protection Agency, 515 F.2d 206, at 214 (8th Cir. 1975). As the Supreme Court noted in Citizens to Preserve Overton Park v. Volpe, *supra*, 401 U.S. at 416, 91 S.Ct. at 823, the scope of this review is a limited one:

> \* \* \* [T]he court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. \* \* \* Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

The new source standards for the corn wet milling subcategory set maximum allowable discharge levels or "loads" for three pollutant measurements: five-day biochemical oxygen demand $(BOD_5)$,[21] total suspended solids (TSS),[22] and pH.[23] The $BOD_5$ and TSS load levels are expressed in terms of pounds per thousand standard bushels (MSBu) of corn processed.[24] For $BOD_5$, the new source standards permit a maximum average of daily values for thirty consecutive calendar days of 20 pounds per MSBu. For TSS, the standards permit a thirty-day average of 10 pounds per MSBu. The maximum allowable discharge level on any single day is three times the thirty-day average, or 60 pounds of $BOD_5$ and 30 pounds of TSS per MSBu. *See* 40 C.F.R. § 406.15.

The petitioners assert that the new source standards are arbitrary and capricious and are not in accordance with law, because there is no adequate basis in the

---

**20.** Section 306(a)(2) provides:

> The term "new source" means any source, the construction of which is commenced after the publication of proposed regulations prescribing a standard of performance under this section which will be applicable to such source, if such standard is thereafter promulgated in accordance with this section.

**21.** While BOD is only a measure of organic pollution's effects, it is on occasion referred to as a pollutant. *See, e. g.* 40 C.F.R. § 128.121 (1974). BOD measures the oxygen-consuming capabilities of organic matter which will be fulfilled as the matter decomposes. $BOD_5$ is a measure of the oxygen-demand of the organic matter after a five-day period, and is one of the most common measurements employed in the field of water quality.

By depressing the oxygen content of the receiving waters, an effluent with a high BOD measurement may drastically alter the aquatic environment, with ill effects on the inhabitants. Frequently, all of the oxygen in the receiving waters is exhausted by the BOD; in such instances, continued decay produces noxious gases and visible stagnation. BOD may also be an indicator of the presence of bacteria.

**22.** Suspended solids include both inorganic and organic materials. While in a suspended state, they may inhibit light penetration and impair photosynthesis in aquatic plants. They also interfere with treatment processes used in purifying drinking water, and may render water unsuitable for certain industrial purposes. When they have settled to form a blanket on the beds of streams and lakes, they may adversely affect the aquatic environment by destroying normal fauna growth.

**23.** Neither the new source standards for pH nor the existing source guidelines for pH are challenged by the petitioners. Our discussion of the new source standards, therefore, deals exclusively with the levels set for $BOD_5$ and TSS.

**24.** One difficulty encountered in reviewing the record stems from the fact that, in discussing the performance of existing plants, the EPA, its consultants, and industry spokesmen frequently recorded measurements solely in terms of milligrams per liter (mg/l), a measurement which reflects the concentration of the effluent. The EPA's decision not to set the standards in terms of mg/l is proper, for any standard based on concentration may be met by diluting the effluent with large quantities of water. Nevertheless, the relationship of much of the backup data to the effluent/raw waste ratio ultimately selected was difficult to assess. To the extent that the agency is able to frame the backup data in the same terms as are used in the final standards, our task in reviewing the regulations would be facilitated.

record for the EPA's conclusion that the standards can be met by utilization of

> * * * the best available demonstrated control technology, processes, operating methods, or other alternatives * * *

§ 306(a)(1).

Specifically, the petitioners contend that the new source standards are predicated on the existence and efficacy of technology which is neither "available" nor "demonstrated" within the meaning of the Act.

■ Initially, we must examine the EPA's justification for the new source standards. Those standards are identical to the 1983 guidelines for existing plants. 40 C.F.R. § 406.13. The 1983 guidelines assume the technology available to meet the 1977 guidelines will be

supplemented by additional technology in 1983.[25]

The 1977 guidelines are predicated on a technology consisting essentially of recirculated cooling water, aerated equalization, activated sludge, and good housekeeping practices.[26] The EPA concluded that this technology would be sufficient to permit compliance with the 1977 guidelines, which consist of 50 pounds each of $BOD_5$ and TSS per MSBu on a thirty-day average, with three times that amount permitted on any single day. *See* 40 C.F.R. § 406.12.

The 1983 guidelines/new source standards are predicated on the availability of the 1977 technology plus the addition of deep bed filtration.[27] The EPA concluded that deep bed filtration will result in the removal of approximately 30 more pounds of $BOD_5$ and 40 more pounds of TSS per MSBu.[28]

---

**25.** The legislative history makes it clear that the Administrator is not to prescribe the technology which must be used, but is rather to set discharge levels which can be met if indicated technology is used. The choice of technology at each plant is left to the operator. *See* Conference Report in *Legislative History* at 311; Senate Report in *id.* at 1477.

**26.** We refer to these processes as the "1977 technology." The supporting document accompanying the corn wet milling regulations sets forth this technology as "Alternative B:"

> Alternative B includes 12 to 18 hours of aerated equalization ahead of the complete-mix activated sludge process and associated chemical feed, sedimentation, and sludge dewatering facilities proposed in Alternative A. * * *

Development Document for Effluent Limitations Guidelines and New Source Performance Standards for the Grain Processing Segment of the Grain Mills Point Source Category [hereinafter *Development Document*] (March 1974) at 93.
"Alternative A," which is embraced by "Alternative B," is defined thus:

> This alternative provides for grit removal, pH adjustment, nutrient addition, complete-mix activated sludge, secondary sedimentation, and centrifugation for solids dewatering. The treatment system does not include equalization or primary sedimentation. * *

*Id.*

**27.** We refer to these processes as the "1983/new source technology." The *Develop-*

*ment Document* at 95 describes "Alternative D," which is the basis of the 1983 guidelines and new source standards:

> In this proposed system, deep bed filtration is added to the activated sludge system presented as Alternative B. * * *

Another portion of the *Development Document* indicates that the 1983/new source technology contains two additional increments to the 1977 technology: isolation and treatment of all process waste waters, and institution of "maximum water reuse." *Id.* at 120–121. These additions appear to be but a tightening up of controls already present in the 1977 technology. Nowhere has the EPA stated on the record the amount of $BOD_5$ and TSS reduction which is expected to result from these additions to the 1977 technology. However, the record as a whole indicates that deep bed filtration was expected to accomplish most of the 30 and 40 pound incremental reductions.

**28.** Because the "raw waste load" in pounds per MSBu varies from plant to plant, it is difficult to express the standards in terms of percentage of removal required. The raw waste load may be high in existing plants because in-plant controls are not ideal or because the end product manufactured is one which inevitably results in a higher raw waste, particularly where a plant manufactures modified corn starches. The following table represents the percentage of reduction required from the 1977 and 1983/new source technologies in the existing plants with the lowest (Plant I) and highest (Plant II) raw waste loads, and in the average plant. Raw waste

The correctness of the EPA's conclusion that the new source standards can be met thus hinges on the validity of four intermediate conclusions: (1) that the 1977 technology is "demonstrated" and "available" for new plants; (2) that the 1977 technology will be sufficient to remove all but 50 pounds each of $BOD_5$ and TSS per MSBu; (3) that the incremental deep bed filter technology is "demonstrated" and "available" for new plants; and (4) that the incremental technology will be sufficient to remove an additional 30 pounds of $BOD_5$ and 40 pounds of TSS per MSBu.

The petitioners concede that the 1977 technology is available for implementation in new plants.[29] They contend, however, that it will not perform up to EPA expectations and that its use will not bring compliance with the 1977 guidelines. They rest their case on the premise that the CPC Plant at Pekin, Illinois, has not been able to meet the 1977 guidelines, despite its implementation of "most" of the 1977 technology. Their reliance is misplaced, for the record indicates that the Pekin Plant discharges 6,000 pounds of $BOD_5$ daily in once-through barometric cooling water without treatment—a practice which does not square with the 1977 technology's requirement that cooling water be recirculated and treated. If the Pekin Plant recirculated this cooling water, treated it in accordance with approved technology, and maintained effective in-plant controls, it would, on the basis of the record, be able to meet 1977 discharge guidelines.

The EPA, on the other hand, based its conclusions as to the performance capabilities of the 1977 technology on the following reasoning:

(1) Data from existing plant operations indicates that the best existing plants have made substantial progress in reducing $BOD_5$ and TSS by using an activated sludge process plus some in-plant controls;

(2) The best existing plants fail to treat large quantities of $BOD_5$ and TSS because they use barometric condensers and discharge the waste from these condensers directly into receiving waters;

(3) By using surface condensers—a demonstrated technology—the raw effluent could be concentrated and subjected to activated sludge treatment thereby achieving significantly greater $BOD_5$ and TSS reductions;

(4) None of the best known in-plant controls are being used in combination in any one plant;

(5) By combining the best known in-plant controls in one plant, greater reductions of $BOD_5$ and TSS would be achievable;

(6) There are no practical reasons which would preclude the implementation of the complete 1977 technology in a new plant.

[7] We conclude that the data was sufficient, the projected results were reasonable, and the petitioners have not demonstrated that the EPA made a clear error of judgment in determining that the 1977 technology, when employed in a new plant, would enable it to comply with the 1977 guidelines.[30]

· figures are from the *Development Document* at 52.

BOD$_5$ REDUCTION

|  | Raw Waste in lbs/MSBu | % Reduction for 1977 Limit (50 lbs.) | % Reduction for 1983/ New Source Limit (20 lbs.) | Incremental Reduction Required |
|---|---|---|---|---|
| PLANT I | 119 | 57.9% | 83.1% | 25.2% |
| PLANT II | 699 | 92.8% | 97.1% | 4.3% |
| AVERAGE | 415 | 87.9% | 95.1% | 7.2% |

TSS REDUCTION

|  | Raw Waste in lbs/MSBu | % Reduction for 1977 Limit (50 lbs.) | % Reduction for 1983/ New Source Limit (10 lbs.) | Incremental Reduction Required |
|---|---|---|---|---|
| PLANT I | 29 | 0% | 65.5% | 65.5% |
| PLANT II | 548 | 90.8% | 96.3% | 5.5% |
| AVERAGE | 211 | 76.3% | 90.5% | 14.2% |

29. Except for the question of the performance capabilities of the 1977 technology, the principal objections raised by the petitioners to the 1977 guidelines relate to their implementation in existing plants and, therefore, need not be considered by us. For the same reason, what we say here with respect to the 1977 technology as it relates to new plants is not ultimately dispositive of the petitioners' challenge to the 1977 guidelines.

30. The petitioners further contend that the single-day allowance of three times the thirty-day average is not sufficient to protect a new plant from the consequences of upsets or "shock-

■ The remaining question, therefore, is whether the record supports the Administrator's conclusion that the technology necessary to achieve the incremental removal of 30 pounds of BOD₅ and 40 pounds of TSS per MSBu is available for use in new plants. We conclude that it does not.

■ The EPA's supporting documents concede that the deep bed filtration technology has not been "demonstrated" within the corn wet milling industry.[31] *See Development Document* at 87, 121. This does not end the inquiry, for new source standards may properly be based on a technology which has been demonstrated outside the industry, if that technology is transferable to it.[32] The EPA contends that deep bed filtration has been proven effective elsewhere and that

loads." *Cf.* note 33, *infra.* They also contend that, in addition to the single-day "variability factor," the regulations must provide for statistically expected "excursions"—those rare occasions on which a well-run plant will exceed even the single-day limit.

There are an infinite number of ways in which the Administrator may approach the related questions of basic standards, variability, and excursions. For example, the industry itself agreed at one point in the rule-making process that an average of 90 pounds of BOD₅ and 30 pounds of TSS per MSBu "*might be* achievable," but urged that a maximum single-day allowance ought to be set at 2.5 times that amount. Statement by Robert C. Liebenow, President of Corn Refiners Association, to ESQWIAC (April 30, 1973) at 5, 13. The ultimate question is not whether the variability factor selected is appropriate, but whether the 1977 guidelines can be achieved with the 1977 technology. We find no clear error in the Administrator's determination that they can.

**31.** The EPA expressed a belief that the Clinton Corn Plant at Clinton, Iowa, which was then undergoing modifications, "*should demonstrate* the applicability of this level of technology to grain milling wastes." *Development Document* at 121 (Emphasis supplied.). However, the Clinton Plant had not yielded test results and, accordingly, the EPA did not rely on data derived from its operation:

> * * * It should be emphasized that these design levels [for the Clinton Plant] are far below those which have been achieved by any other plant in the corn wet milling or related industries *and cannot yet be considered as demonstrated technology.* (Emphasis supplied.)

*Id.* at 87.

Subsequently, the EPA supplied information to this Court which indicated that the Clinton Plant had begun to achieve an effluent reduction sufficient to comply with the 1983 guidelines/new source standards. The petitioners responded to that data by submitting their own data indicating that the Clinton Plant was not even complying with the 1977 guidelines. In light of this factual dispute, the EPA retreated, and counsel informed the Court at oral argument that the Clinton Plant data was not being submitted for the purpose of show-

ing that the technology there used would in fact result in the predicted effluent reduction. Hence, we need not decide whether post-promulgation data may properly be presented on judicial review to support the reasonableness of a prediction. *Compare* Amoco Oil Co. v. Environmental Protection Agency, 163 U.S. App.D.C. 162, 501 F.2d 722, 729 n.10 (1974), *with* Dry Color Manufacturers' Association, Inc. v. Department of Labor, 486 F.2d 98, 108 (3rd Cir. 1973).

We stress, however, that the EPA will be open, on remand, to consider any data obtained from the operation of the Clinton Plant or others, including such data as bears on the availability of the 1983/new source technology and the results which may be achieved thereby.

**32.** Although the legislative history does not speak of "transferable technology," we think that it is consistent with this interpretation of the terms "demonstrated" and "available." The House Report stated:

> It will be sufficient, for the purposes of setting the level of control under available technology, that there be one operating facility which demonstrates that the level can be achieved or that there is sufficient information and data from a relevant pilot plant or semi-works plant to provide the needed economic and technical justification for such a new source.

*Legislative History* at 798.

The Senate Report declared:

> As used in this section, the term "available control technology" is intended to direct the Administrator to examine the degree of effluent reduction that has been or can be achieved through the application of technology which is available or normally can be made available. This does not mean that the technology must be in actual, routine use somewhere. Rather, it means that the technology must be available at a cost and at a time which the Administrator determines to be reasonable.

*Id.* at 1476, U.S.Code Cong. & Admin.News, 1972, p. 3724. *Cf.* Portland Cement Association v. Ruckelshaus, 158 U.S.App.D.C. 308, 486 F.2d 375, 391 (1973) (discussing the meaning of "available" in the new source provisions of the Clean Air Act Amendments of 1970).

it is readily transferable to corn wet milling.

■ To base its standards on transfer technology, the EPA must: (1) determine that the transfer technology—in this case, deep bed filtration—is available outside the industry; (2) determine that the technology is transferable to the industry; and (3) make a *reasonable* prediction that the technology, if used in the industry, will be capable of removing the increment required by the new source standards. *Cf.* Portland Cement Association v. Ruckelshaus, 158 U.S.App. D.C. 308, 486 F.2d 375, 391–392 (1973); International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 628–629 (1973).

The petitioners concede that deep bed filtration has been successfully used in other industries and in municipal treatment works. They deny, however, that deep bed filtration is adaptable to the corn wet milling industry and deny that the use of such filters in the industry will result in the removal of the incremental 30 pounds of $BOD_5$ and 40 pounds of TSS per MSBu. The basis for their contention is the fact that corn wet milling industry effluent is subject to "shockloads,"[33] and contains such high concentrations of suspended solids that clogging of the filtration system is to be expected.[34]

Given the unique nature of the corn wet milling effluent, and the apparent relevance of its uniqueness to the efficacy of deep bed filtration,[35] the EPA cannot rely on a presumption of transfera-

---

**33.** The record bears out this contention:

> * * * It must be recognized that the treatment of high strength carbohydrate wastes is difficult. Upset conditions may occur that result in higher $BOD_5$ and suspended solids discharges than normal. While the in-plant modifications and controls and the treatment sequence defined as best practicable control technology currently available [the 1977 technology] will minimize these upsets, they may still occur. * * *

*Development Document* at 117.
The EPA has elsewhere declared that upsets in the biological treatment facility may have a critical effect on deep bed filtration:

> The single most important factor affecting filter performance is the quality of the secondary effluent produced by the biological treatment. If consistently good performance is exhibited by the biological treatment system, good filter performance can be expected. Conversely, if the biological facility is subject to frequent upsets, filtration will be much more difficult.

EPA, Process Design Manual for Upgrading Existing Wastewater Treatment Plants [hereinafter *Process Design Manual*] (October 1974) at 7–17.

**34.** The 1977 technology includes the recirculation of cooling waters for the purpose of achieving more highly concentrated raw wastes, thus rendering them more susceptible to biological (activated sludge) treatment. Thus, the EPA has stated that the *treated* wastes pursuant to the 1977 technology will have TSS concentrations ranging from 50 to 200 mg/l, and that the higher values "are gen-

erally for new plants that practice maximum water recycling." *Development Document* at 113. It is this biologically treated waste which will be sent to the deep bed filters. Moreover, the 1983 technology is predicated on even more water recirculation and "maximum water reuse," *see* note 27, *supra,* and hence even higher concentrations of TSS in the biologically treated wastes. In light of these facts, the EPA's conclusion in the *Development Document* at 122 that the effluent arriving at the deep bed filters will range from 30 to 50 mg/l in TSS seems inexplicable.

By contrast, the effluent arriving at the filters in municipal treatment plants can normally be expected to be below 30 mg/l, and in discussing the capabilities of deep bed filtration elsewhere, the EPA does not discuss capability to handle concentrations above 50 mg/l in TSS. *See Process Design Manual* at 7–18 to 7–22.

In a study completed for petitioner CPC International by consultant Roy F. Weston, Inc., in December of 1973, the consultant concluded that, for best results, waste with 100 mg/l of TSS concentrations could only be fed to the filters at a rate of 1.7 gallons per minute foot. *See* Reply Brief for Petitioners, Appendix H at 10. This compares to a rate of 5 gallons per minute foot used by municipalities. *See Process Design Manual* at 7–17. Because the flow rate is so low, a huge filter would be required. In effect, the petitioners contend that the EPA's policy of *requiring* heavy concentrations of TSS by the 1977 technology has contributed to the unsuitability of deep bed filters to the industry.

**35.** *See* notes 33 and 34, *supra.*

bility of that technology.[36] Its conclusion that the technology is transferable, and its prediction that the use of the technology within the industry will result in removal of the 30 and 40 pound increments must be supported by evidence in the record.[37] The District of Columbia Circuit, in examining new source standards under the Clean Air Act, has stated the matter well:

> * * * The Administrator may make a projection based on existing technology, though that projection is subject to the restraints of reasonableness and cannot be based on "crystal ball" inquiry. * * * [T]he question of availability is partially dependent on "lead time", the time in which the technology will have to be available. Since the standards here put into effect will control new plants immediately, as opposed to one or two years in the future, the latitude of projection is correspondingly narrowed. If actual tests are not relied on, but instead a prediction is made, "its validity as applied to this case rests on the reliability of [the] prediction and the nature of [the] assumptions." *International Harvester,* at 45 [155 U.S.App.D.C. at 438, 478 F.2d at 642].

Portland Cement Ass'n v. Ruckelshaus, *supra,* at 391–392.

We conclude that the prediction as to the efficacy of deep bed filtration in the corn wet milling industry is not a reasonable one, because there is no support in the record for that prediction. The sum total of the evidence in the record as to the efficacy of deep bed filtration in or outside of the corn wet milling industry consists of the following:[38]

(1) A statement that deep bed filtration has been used outside the industry for several years, and produces a "high quality effluent." *Development Document* at 121.

This statement is not supported in the record and the degree of $BOD_5$ and TSS reduction obtained by other industries and municipalities is nowhere quantified.

(2) Statements that:

"It is *anticipated* that the technology of removing biological solids by filtration will improve rapidly * * *." *Id.* at 120 (Emphasis supplied.).

"Deep bed filtration will remove most of the remaining suspended solids * * *." *Id.* at 121.

"[I]t is * * * *felt* that" the new performance standards can be met with the technology. *Id.* at 126 (Emphasis supplied.).

The technology "*should* significantly reduce the raw waste loads" and the new source standards "*should* be achievable." *Id.* at 127 (Emphasis supplied.).

The Clinton Plant "*should* demonstrate" the transferability of the technology to the industry.[39] *Id.* at 121 (Emphasis supplied.).

These statements are likewise not supported in the record. We can find no

---

**36.** Moreover, even if the EPA could rely on a presumption of transferability, the record is barren of any evidence as to what the performance of deep bed filters has been outside the industry.

**37.** The Administrator may, of course, predict results. *See* Portland Cement Ass'n v. Ruckelshaus, *supra,* at 401–402. But "[o]ne must distinguish between prediction and prophecy." International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 478 F.2d 615, 642 (1973).

**38.** The EPA in its presentation to this Court urges an additional basis for its conclusion: the fact that some municipalities are currently treating corn wet milling wastes and have found those wastes to be "compatible." This basis is not adequately developed, however, for there is nothing in the record to indicate that the municipal treatment plants which are currently handling corn wet milling wastes are able to comply or are in fact complying with the new source standards applicable to corn wet milling plants.

**39.** *See* note 31, *supra.*

concrete data, test results, literature, or expert opinion tending to support the EPA's feelings, anticipations and prophecies.

To the contrary, the EPA originally proposed a 1977 guideline of 35 pounds per MSBu of TSS, only to raise it to 50 pounds in the final regulations, with the following comment:

> * * * EPA believes that while the 30 lb limit might be attainable, the technology is not yet available to achieve this effluent level on a routine basis. * * *

39 Fed.Reg. 10512 (1974).[40]

Further doubt is cast on the achievability of the new source standards in a letter sent by the Department of Agriculture to the EPA on July 25, 1973:

> If the Level II (July 1, 1983) standards are to be applied immediately to any new construction, this would appear to delay any new construction by several years because of recognized lack of proven control and treatment technologies for economically achieving the proposed levels. Is such delay acceptable?

It follows that, on the basis of *this record,* we have no alternative but to reject the new source standards. There remains the question of remedy. The Act directs that the standards should have been promulgated more than one year ago. *See* § 306(b)(1). We believe that this mandate to proceed expeditiously would not be furthered if we simply held that the new source standards

are unacceptable. Accordingly, we remand to the EPA with directions set forth below, and retain jurisdiction pending the remand. *See* South Terminal Corp. v. Environmental Protection Agency, 504 F.2d 646, 665–667 (1st Cir. 1974); International Harvester Co. v. Ruckelshaus, *supra,* at 649; Kennecott Copper Corp. v. Environmental Protection Agency, 149 U.S.App.D.C. 231, 462 F.2d 846, 850–851 (1972). *Cf.* 28 U.S.C. § 2106.

The proceedings in the EPA on remand shall be conducted in accordance with the procedural requirements of the Act, except that the time periods shall be shortened so as to permit the EPA to enter its final order in the matter within 120 days. Within that time, the EPA shall either furnish support for the new source standards previously published, or establish new ones which can be achieved with the best available demonstrated control technology.[41] If the petitioners are dissatisfied with the Administrator's final action, they shall have ten days to file with this Court any objections to his final order. In that event, an accelerated briefing schedule shall be arranged with the clerk of this Court to review the Administrator's action.

On remand, we instruct the EPA to deal with one other matter which is not adequately covered in the record. Section 306(b)(1)(B) directs the Administrator to consider the issue of costs in adopting new source standards. This consideration is particularly important here, since the record indicates that capital and operating costs may be of more significance in this industry than in some others, due to low profit margins, the

---

**40.** Similarly, the *Development Document* at 127 declared of the 1983 new source technology:

> * * * Inasmuch as this type of treatment has not been specifically applied to corn wet milling wastes, initial operating experience with such systems may not fully meet the expected * * * $BOD_5$ and suspended solids removals * * *.

**41.** The EPA is not bound by its past indication that the best available demonstrated control technology would include deep bed filtration.

If there are other methods which will result in reductions equal to or better than the amount required by the 1983 guidelines, or which will result in a no discharge level, the EPA can—and indeed should—promulgate *new source* standards based on such technology. *See* § 306(a)(1), requiring a no discharge standard where practicable. This freedom to change approach is but a specific application of the Act's provision that the Administrator shall revise the new source standards "from time to time." § 306(b)(1)(B).

highly volatile nature of raw material prices, and competitive substitutes which make it difficult to pass on increased costs to consumers.[42] *Compare* Portland Cement Ass'n v. Ruckelshaus, *supra* at 387–388, 390.

The current record concerning costs for new sources is unsatisfactory in two major respects. First, the EPA has not projected separate operating and capital cost figures for new plants, but has relied on those prepared with respect to modifying existing plants to comply with the 1983 guidelines. It must correct this defect on remand. It may well be that these costs will be less for new plants than for modified ones, but we cannot assume this to be the case. Second, the EPA based its cost figures on 1971 prices, even though the *Development Document* and the regulations were published in March of 1974. More current figures than this are available, and should be used by the EPA in setting forth projected capital and operating costs for new plants.

## III. THE PRETREATMENT STANDARDS FOR NEW SOURCES.

Section 307(c) of the Act[43] provides that the Administrator shall promulgate pretreatment standards for new plants

**42.** Costs become an increasingly important factor as pollution reduction enters the 95 to 100 percent range. *See, e. g., Legislative History* at 1127, 1147, 1150 (testimony of Paul V. McCracken, Chairman of the Council of Economic Advisers, before the House Subcommittee on Public Works); *id.* at 1222 (testimony of Mr. Ruckelshaus before the Subcommittee). The new source standards will require removal in this range for some plants, if past raw waste figures are predictive. *See* tables in note 28, *supra.*

**43.** That section provides:
In order to insure that any source introducing pollutants into a publicly owned treatment works, which source would be a new source subject to section 306 of this title if it were to discharge pollutants, will not cause a violation of the effluent limitations established for any such treatment works, the Administrator shall promulgate pretreatment standards for the category of

which introduce their pollutants into publicly owned treatment works. The pretreatment standards promulgated for new plants in the corn wet milling industry, 40 C.F.R. § 406.16, incorporate by reference a general set of pretreatment standards earlier promulgated in Part 128 of title 40 of the Code of Federal Regulations. *See* 38 Fed.Reg. 30982–84 (1973). Those standards split pollutants into two categories: "compatible" and "incompatible." Compatible pollutants include BOD, TSS and pH. *See* 40 C.F.R. § 128.121. Under the general pretreatment standards incorporated by the new source pretreatment standards, a plant is not required to pretreat its effluent for removal of compatible pollutants, except as required by 40 C.F.R. § 128.131 or by a state or municipality. *See id.* § 128.132. Since the corn wet milling effluent is a compatible one within the meaning of the regulations,[44] new plants in the industry need worry only about the applicability of § 128.131. That section provides:

No waste introduced into a publicly owned treatment works shall interfere with the operation or performance of the works. Specifically, the following wastes shall not be introduced into the publicly owned treatment works:

such sources simultaneously with the promulgation of standards of performance under section 306 of this title for the equivalent category of new sources. Such pretreatment standards shall prevent the discharge of any pollutant into such treatment works, which pollutant may interfere with, pass through, or otherwise be incompatible with such works.

**44.** To the extent that there are any incompatible pollutants in corn wet milling effluent, the regulations clearly provide that they need not be pretreated. Section 406.16 provides that
* * * the pretreatment standard for incompatible pollutants introduced into a publicly owned treatment works shall be the standard of performance for new sources specified in 40 C.F.R. 406.15. * * *
The new source standards, of course, do not require treatment of any pollutants other than BOD, TSS and pH, all of which are compatible pollutants. The quoted portion of § 406.16, therefore, is reduced to gibberish.

(a) Wastes which create a fire or explosion hazard in the publicly owned treatment works.

(b) Wastes which will cause corrosive structural damage to treatment works, but in no case wastes with a pH lower than 5.0, unless the works is designed to accommodate such wastes.

(c) Solid or viscous wastes in amounts which would cause obstruction to the flow in sewers, or other interference with the proper operation of the publicly owned treatment works.

(d) Wastes at a flow rate and/or pollutant discharge rate which is excessive over relatively short time periods so that there is a treatment process upset and subsequent loss of treatment efficacy.

The petitioners complain that this standard is not really a standard, because it is too vague and uncertain. While their attack on § 128.131 is in the form of a general broadside, their only real complaint concerns subparagraph (d).[45] We conclude that the petitioners' objection to that subparagraph is well taken. The record clearly indicates that corn wet milling effluent is subject to shockloads.[46] A new plant operator whose shockload is determined to be "excessive over [a] relatively short time period * * * [causing] loss of treatment efficacy," would be subject under subparagraph (d) to substantial civil or criminal penalties. See § 309. This standard is too vague to warn the industry of the scope of prohibited conduct. On remand, therefore, the EPA shall review subparagraph (d) of § 128.131, as it applies to the corn wet milling industry, and shall amend the regulation so as to define in a reasonably specific manner what it considers to be an excessive discharge to a municipal plant over relatively short periods of time. We do not require, as the petitioners would have us do, that the regulations must be amended to provide that a new corn wet milling plant may discharge all compatible wastes into municipal treatment works without limitation.

We recognize that the Administrator's task in defining those shockloads which will upset municipal treatment works is a difficult one. Obviously such a definition is dependent on the size and capabilities of the particular works which is receiving the waste. Nevertheless, this is a difficulty with which the Administrator must grapple.

The pretreatment standards for new plants are remanded for reconsideration and amendment of the incorporated § 128.131(d), as it relates to new sources in the corn wet milling industry. The Administrator shall complete his action in that regard within the time limits and procedural requirements set forth in Part II of this opinion. This Court retains jurisdiction in the matter, and will hear objections to the Administrator's action on remand in accordance with the provisions of Part II of this opinion.

## IV.  SUMMARY.

The petitions challenging the validity of the guidelines for existing sources are dismissed. The new source standards and the pretreatment standards for new sources are remanded to the Administrator of the EPA for proceedings consistent with this opinion. Each party to this proceeding shall bear its own costs.

---

**45.** The EPA conceded in its brief that normal corn wet million effluent does not contain any of the characteristics of § 128.131(a), (b) or (c). See Respondent's Brief at 99.

**46.** See note 33, supra.