CORN REFINERS ASSOCIATION, INC., CPC International, Inc., Anheuser-Busch, Inc., Grain Processing Corporation, the Hubinger Company, Petitioners,

v.

Douglas M. COSTLE, as Administrator, Environmental Protection Agency, Respondent.

No. 78–1069.

United States Court of Appeals, Eighth Circuit.

Submitted Dec. 15, 1978.

Decided April 2, 1979.

■■■■■■■■

Charles F. Lettow, Cleary, Gottlieb, Steen & Hamilton, Washington, D. C. on brief, for petitioner.

Michael A. McCord, Atty., Dept. of Justice, Washington, D. C. (argued), Joan Z. Bernstein, Gen. Counsel, Jeffrey M. Gaba, Atty., Environmental Protection Agency, James W. Moorman, Asst. Atty. Gen., and Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., on brief, for respondent.

Before LAY and HENLEY, Circuit Judges, and WANGELIN, District Judge.[*]

HENLEY, Circuit Judge.

This case comes before us on a petition for review of a decision of the Administrator of the Environmental Protection Agency (EPA). We have jurisdiction pursuant to 33 U.S.C. § 1369(b)(1)(E). We deny the petition for review.

Petitioners are four companies engaged in the corn wet milling industry [1] and their association, the Corn Refiners Association, Inc. The instant petition for review is the latest episode in a lengthy series of administrative and judicial proceedings relating to the promulgation of effluent limitation regulations for existing plants engaged in the corn wet milling industry. The matter has twice reached this court previously. In *CPC Int'l, Inc. v. Train,* 515 F.2d 1032 (8th Cir. 1975) (*CPC I*), we dismissed protective petitions for review of existing plant guideline regulations and held that such review should be had in the district court. We did, however, review concurrently promulgated regulations governing new plants (new source standards) and remanded them to EPA for further proceedings.[2]

Thereafter, in *Grain Processing Corp. v. Train,* 407 F.Supp. 96 (S.D.Iowa 1976), the district court found EPA's existing-plant effluent limitation regulations invalid in several respects. EPA appealed that decision to this court. We entered an order deferring consideration of the appeal in light of the then pending Supreme Court decision in *E. I. duPont deNemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), and called for an interim remand to EPA so that the parties might have the opportunity to resolve as much of the dispute as possible during the pendency of the *duPont* litigation.

The parties ultimately arrived at a comprehensive settlement dealing with existing-plant effluent limitation regulations. Only one question remained unresolved and that is the subject of the petition at hand. The question, as phrased by the parties, is "whether EPA clearly erred in not making any express provision, either by way of the regulations or by a finding which would free permit authorities to insert appropriate provisions in permits, to account for excursions, as the issue relates to 40 C.F.R. §§ 406.12 and 406.13."

An "excursion" (also called an "upset") is a situation in which effluent limitations are unintentionally exceeded for reasons beyond the reasonable control of the permittee and in spite of the proper operation of treatment facilities meeting the statutorily required technological criterion.[3] EPA's regulations covering existing plants in the corn wet milling industry, published at 42

---

[*] The Honorable H. Kenneth Wangelin, United States District Judge, Eastern District of Missouri, sitting by designation.

1. The companies are: CPC International, Inc.; Anheuser-Busch, Inc.; Grain Processing Corporation; and The Hubinger Company.

2. Thereafter, in *CPC Int'l, Inc. v. Train,* 540 F.2d 1329 (8th Cir. 1976) (*CPC II*), cert. denied, 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977), we considered the new plant regulations as resubmitted by EPA. The standards governing biological oxygen demand (BOD) were upheld, but the standards for total suspended solids (TSS) were overturned and remanded to EPA for revision.

3. By July 1, 1977 effluent limitations for point sources, other than publicly owned treatment works, required the application of "the best practicable control technology currently available." 33 U.S.C. § 1311(b)(1)(A). By July 1, 1984 effluent limitations for existing point sources shall require the application of "the best conventional pollutant control technology." 33 U.S.C. § 1311(b)(2)(E).

Fed.Reg. 62368–62372 (December 12, 1977),[4] make no explicit provision for excursions. In addition, because "EPA has determined that the kinds of events which the industry proposes should be accorded exceptional consideration by the permit-issuer [*i. e.,* excursions] have already been incorporated into the data base from which the guidelines were derived," 42 Fed.Reg. at 62371, the permit-issuers are precluded from providing exemptions for most, if not all, excursions in the individual permits. *See* Decision of the General Counsel on Matters of Law Pursuant to 40 C.F.R. § 125(m), No. 57 (March 16, 1977). Thus the question whether to prosecute a mill for an excessive excursion discharge is left to the exercise of EPA's discretion on a case-by-case basis.

The parties' arguments can be briefly stated. Petitioners note that the Federal Water Pollution Control Act Amendments of 1972 (the Act), 33 U.S.C. § 1251 *et seq.,* requires point sources of pollution to utilize the "best practicable control technology currently available" (BPCTCA) prior to 1984. 33 U.S.C. § 1311(b)(1)(A); *see* note 3, *supra.* Even in a mill employing properly operating BPCTCA technology, however, excursions may occur from time to time. Therefore, by failing to provide that excursions do not constitute violations of the effluent limitation regulations, EPA may be actually imposing on petitioners a standard which is greater than that imposed by the Act.

EPA counters with a number of arguments why including an express provision excusing excursions would frustrate, or at least not further, the policies underlying the Act.[5]

The parties' arguments largely track the rationales of two recent, and conflicting,

decisions. In *Marathon Oil Co. v. Environmental Protection Agency,* 564 F.2d 1253 (9th Cir. 1977), the court overturned EPA's refusal to include excursion provisions in individual effluent limitation permits issued to several oil companies with respect to both offshore oil platforms and onshore facilities. *See also FMC Corp. v. Train,* 539 F.2d 973, 986 (4th Cir. 1976).[6] However, in *Weyerhaeuser Co. v. Costle,* 191 U.S.App. D.C. 309, 590 F.2d 1011 (1978), the court upheld EPA's industrywide effluent limitation regulations for the bleached paper industry against a challenge that they were deficient because they did not include express provisions regarding excursions. *See also United States Steel Corp. v. Train,* 556 F.2d 822, 842 n.33 (7th Cir. 1977); *Am. Petroleum Inst. v. Environmental Protection Agency,* 540 F.2d 1023, 1035–36 (10th Cir. 1976), *cert. denied sub nom. Exxon Corp. v. Environmental Protection Agency,* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977).

We are thus faced with a rather clear conflict in the circuits on this matter. After weighing the arguments on both sides, we agree with EPA and the District of Columbia Circuit's decision in *Weyerhaeuser* that no express provision regarding excursions is required.

We begin by noting that there is substantial force to petitioner's argument that EPA's regulations seemingly require petitioners to do the impossible—*i. e.,* to prevent excursions which, by their very nature, can occur even in a properly operated facility meeting BPCTCA standards. Against this hardship, however, we must weigh the effect which a decision requiring excursion provisions in the regulations or individual

4. A technical correction appears at 42 Fed.Reg. 64345 (December 23, 1977).

5. EPA also relies on a "generic" excursion provision which has been proposed, but not yet approved, by EPA. The proposed regulation appears at 43 Fed.Reg. 37094 (August 21, 1978). In view of our disposition of the case, we have no occasion to comment upon this proposed excursion regulation.

6. In addition to the cases cited, petitioners rely upon an analogy to regulations and cases relating to the Clean Air Act, as amended, 42 U.S.C. § 7401 *et seq.* The analogy is not persuasive, however, because the structure and underlying concerns of ambient air standards are different from effluent limitations under the Federal Water Pollution Control Act Amendments of 1972. *See Weyerhaeuser Co. v. Costle,* 191 U.S.App.D.C. 309, 356 n.85, 590 F.2d 1011, 1058 n.85 (1978).

permits would have on the important policies underlying the Act.

First, we note that a decision requiring EPA to make provisions for excursions might hamper EPA's ability to "force technology." *Weyerhaeuser Co. v. Costle, supra,* 191 U.S.App.D.C. at 355, 590 F.2d at 1057. That is, Congress intended effluent limitations to compel plants to improve their antipollution performance, even when technological innovation is required, *id.* 191 U.S.App.D.C. at 359, 590 F.2d at 1061, thus furthering Congress' ultimate goal of entirely eliminating the discharge of pollutants into the nation's waters. 33 U.S.C. § 1251. Denying excursion provisions justifiably compels the industry to develop the technological capability necessary to avoid excessive discharges.

Second, the compulsory inclusion of excursion provisions can lead to serious problems of enforcement. It is axiomatic that Congress intended enforcement of the Act to be "swift and direct." *A Legislative History of the Water Pollution Control Act Amendments of 1972,* Senate Committee on Public Works, 93d Cong., 1st Sess. at 1483 (1973). Enforcement is "swift and direct" when the case turns on the sharply defined question whether the plant discharged more pollutant than allowed under the simple numerical standards contained in the effluent discharge regulations. Excursion provisions cannot, however, be properly framed in simple numerical terms[7] and must therefore be stated in more complex terms relating to questions of fault and justification. As the *Weyerhaeuser* court noted, once such an excursion provision is promulgated, the outcome of an enforcement proceeding

> depends on murky determinations concerning the sequence of events in the

plant, whether those events would have been avoidable if other equipment had been installed, and whether the discharge. was within the intent of the excursion provision. Consequently, what Congress planned as a simple proceeding suitable for summary judgments would become a form of inquest into the nature of system malfunction.

191 U.S.App.D.C. at 356, 590 F.2d at 1058.

Third, petitioners' argument that excursions must be dealt with by regulations rather than left to administrative discretion overlooks the fact that some degree of administrative discretion is inevitable in these situations. The very nature of excursions and the virtually infinite number of causes of excursions make it impossible to foresee all problems which may arise and deal with them in particularized regulations. In short, at some point, violations of regulatory limits due to wholly unforeseen and uncontrollable occurrences must be a matter for administrative discretion rather than advance administrative regulation. *Id. See CPC Int'l, Inc. v. Train,* 540 F.2d 1329, 1338 (8th Cir. 1976), *cert. denied,* 430 U.S. 966, 97 S.Ct. 1646, 52 L.Ed.2d 357 (1977). Where the line is to be drawn between situations governed by a general rule and situations to be handled on a case-by-case basis is largely a matter for EPA to decide and we are persuaded that here it has drawn the line at a permissible place.[8]

Accordingly, we uphold EPA's decision to deny excursion provisions and deny the petition for review.

---

7. It would, of course, be possible to formulate a numerical excursion provision providing that effluent limitations could be exceeded on a given number of days per year. Such a provision would be tantamount to giving mills a license to store and then dump wastes at will. *See Am. Petroleum Inst. v. Environmental Protection Agency, supra,* 540 F.2d at 1036.

8. We will not assume, as petitioners seem to suggest, that EPA will not exercise its discretion in a reasonable and good faith manner. Nor are we persuaded that, despite proper exercise of administrative discretion, the threat of citizen suits under 33 U.S.C. § 1365 requires specific provision for excursions. *See Weyerhaeuser Co. v. Costle, supra,* 191 U.S.App.D.C. at 357 and n.86, 590 F.2d at 1059 and n.86.